AMERICAN ARBITRATION ASSOCIATION | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

## AMERICAN ARBITRATION ASSOCIATION

Case Number: 01-19-0001-8743

In the Matter of the Arbitration between

Tiffany Grays
-vs-
Auto Mart USA

## INTERIM AWARD OF ARBITRATOR

I, Julie M. Williamson, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the Parties at an evidentiary hearing held in Littleton, Colorado on February 10-11, 2020, do hereby issue this INTERIM AWARD as follows:

### Background

1. This proceeding concerns the attempted purchase by Claimant, Tiffany Grays, of a used vehicle from Respondent, Auto Mart USA. After accepting Claimant's down payment and trade-in vehicle, Respondent was unable to secure financing for the balance. Respondent exercised its contractual right to cancel the contract and returned Claimant's deposit check and trade-in to her. Claimant contends that because of Respondent's misconduct in the transaction, she is entitled to economic damages of at least $34 million.

2. This proceeding follows a referral to arbitration of numerous claims by the United States District Court for the District of Colorado in a civil action that remains pending. For clarification of the claims that Claimant was submitting to arbitration, I required Claimant to file amended demands for arbitration. Claimant's Third Amended Demand for Arbitration comprises 19 pages of single-spaced text and asserts 15 separate common law and statutory counts. In a further effort to understand the claims, I required both sides to submit pre-hearing briefs outlining the elements of each claim and the evidence that supported (or for Respondent, refuted) the claim.

3. This proceeding was brought under the Consumer Arbitration Rules of the American Arbitration Association ("AAA"). Under Rule 43(a), my award must provide the concise written reasons for the decision. Because of the goal of conciseness, this award does not reference every piece of evidence presented at the hearing or every detail of every claim asserted by Claimant. Similarly, the reasons given below do not itemize every reason that I granted or denied each claim.

4. As of February 5, 2020, Claimant had indicated that she planned to present up to 17 witnesses in the two days allotted to the hearing, many of them medical professionals who would testify as to her health problems allegedly resulting from her bad experience in attempting to purchase a vehicle from Respondent. To make sure that both sides had a fair opportunity to present all of their evidence on liability and monetary damages in the allotted two days, I bifurcated the hearing. Accordingly, the February 10-11, 2020, hearing concerned the merits of the claims and defenses, and all monetary damages, excluding damages for emotional distress, bodily injury, and pain and suffering. I also stated that once I ruled on the merits of the claims, the parties would have the opportunity to brief the issue of whether Claimant was entitled to recover for emotional distress, bodily

injury, and pain and suffering on any claim on which I ruled in Claimant's favor.

5. At the evidentiary hearing, Claimant acted *pro se* and Respondent was represented by Michael G. McKinnon, Esq. Claimant, who is not an attorney, presented a very organized case. The hearing lasted more than fifteen hours (excluding breaks) over two days, the second day of hearing concluding at 7:51 p.m. Claimant called seven witnesses who testified in person and two witnesses who testified by telephone. Respondent questioned the witnesses when they testified in Claimant's case and called no additional witnesses. Approximately 45 exhibits were admitted into evidence. The parties presented brief opening statements and closing arguments. In addition, they were given the opportunity to submit supplemental legal authority, which they filed on February 13, 2020, whereupon the hearing was declared closed.

**Facts**

6. On March 17, 2018, Claimant was searching the internet for vehicles and found Respondent's advertisement for a 2015 Mitsubishi Outlander. She called Respondent and made an appointment to look at the Outlander.

7. After Claimant arrived at Respondent's dealership on March 17, 2018, she was told that the Outlander had a salvage title. Respondent's online advertisement of the Outlander had not shown it was a salvage vehicle. Claimant stated that she was not interested in a salvage vehicle, but agreed to stay and look at other available vehicles.

8. At the dealership, Respondent's sales representative showed Claimant a total of three vehicles. Claimant decided to purchase one of the vehicles, a 2013 Dodge Journey, and Claimant and Respondent's sales representative began the process of filling out the required paperwork.

9. As Claimant needed financing to complete the purchase, Claimant was asked to provide information sufficient to determine whether she was likely to qualify for a loan. Claimant signed a written form dated March 17, 2018, authorizing Respondent to perform a credit check. Although there was conflicting evidence as to exactly when in the process the conversation occurred, at some point Claimant asked whether the dealership would be performing a "soft" credit inquiry. By "soft" inquiry, she meant an inquiry that would not show up on her credit report and affect her credit rating. This fact was important to Claimant as she had been working hard to improve her credit rating following her 2015 bankruptcy filing. She was told by one of Respondent's managers that Respondent would conduct a soft inquiry. Claimant learned several days later that the statement was not true and that in fact Respondent, as well as many of the lenders from whom Respondent sought financing for the vehicle purchase, performed "hard" credit inquiries, which did appear on her credit report.

10. In reliance on Respondent's assurance that it would conduct a soft inquiry, Claimant proceeded to execute the documents required to purchase the 2013 Dodge Journey on March 17, 2018. The terms included Claimant's payment of a $1,000 deposit and trade-in of a 2008 Dodge Durango valued at $2,000.00. As part of that transaction, Claimant signed and/or initialed several documents that were part of the contract with Respondent, including without limitation:

    a. A Buyers Order and Invoice, which set forth the purchase terms and stated "ALL TRANSACTIONS ARE SUBJECT TO SELLER SECURING FINANCING APPROVAL ON ANY DEFERRED BALANCE.";

    b. A Retail Installment Sale Contract with Arbitration ("RISC"), which contained Federal Truth-in-Lending Disclosures, agreed financing terms, and an outlined box on the second page entitled "SELLER'S RIGHT TO CANCEL," which stated in pertinent part, "Seller agrees to deliver the vehicle to you on the date this contract is signed. Seller intends to assign this contract to a financial institution. If Seller does not assign this contract to a financial institution, Seller may cancel this contract upon written notice. In that event, you may enter into a new contract with different financing terms or you may pay with alternate funds arranged by you. Upon receipt of our notice, you must immediately return the vehicle to Seller.";

  c. Disclosures that stated in pertinent part that "WARNING: Only the terms and conditions written into these documents are part of the contract. Be sure that any oral representations are also written into these documents otherwise they cannot be enforced.";

  d. An application for financing; Respondent has been unable to find a copy of the loan application but submitted it to multiple financial institutions.

11. Claimant testified that she did not read any of the documents that she signed.

12. At the time she signed the contract to purchase the 2013 Dodge Journey, Claimant had been employed at Granicus for two-and-a-half months. Claimant lost that job on March 20, 2018, for reasons unrelated to the subject transaction. Since that time Claimant has been unable to obtain long-term employment that would provide a livable wage. At the hearing, Claimant did not present evidence that her inability to find a long-term job was directly caused by Respondent's allegedly wrongful conduct. However, she suggested that Respondent's conduct caused her to develop health problems that prevented her from working full time. Accordingly, as outline below, I will reserve ruling on that issue unless and until evidence on Claimant's claims of emotional distress, bodily injury, or pain and suffering is admitted.

13. Respondent was unwilling to finance the transaction itself and sent Claimant an adverse action letter on April 6, 2019. No other financial institutions were willing to finance the loan as written. Prestige Financial Services issued conditional approval, but in fact it was approval for different terms than the RISC, including requiring a 17.99% interest rate. Final approval also would have required a telephone interview with Claimant, by which time Claimant would have lost her job, likely precluding loan approval.

14. In the required adverse action letters, all the potential lenders indicated that they had reviewed Claimant's credit score. They cited a number of reasons for their denial of her loan application, including serious delinquency and public record of collections filed, the proportion of loan balances to loan amounts being too high, the time since delinquency being too recent or unknown, the number of accounts with delinquency, bankruptcy, delinquent credit with others, and too many inquiries in the last 12 months.

15. After learning that no lender would provide financing for the transaction, Respondent's representative called Claimant and asked her to bring the vehicle back. Claimant returned the 2013 Dodge Journey and picked up her trade-in vehicle. Respondent also refunded Claimant's deposit.

16. During the course of several telephone conversations, Respondent's representative confirmed that he had told Claimant that Respondent would be performing a soft inquiry. That representation was mistaken; Respondent's practice was to only perform hard inquiries. Claimant complained and asked to have Respondent's inquiry removed from her credit history. Respondent was unable to do so because Claimant had signed the required credit authorization and removing the inquiry would have required Respondent to represent to the credit rating agency that Claimant had not authorized the inquiry.

17. Claimant asserts that the hard inquiries on her credit report by Respondent and the financial institutions from whom Respondent attempted to obtain financing had a negative impact on her credit rating. However, she candidly admitted that she was unable to quantify the impact. The effort to do so was made particularly difficult by the fact that on the same day she attempted to purchase the 2013 Dodge Journey, she had submitted an online form with another auto dealer, which form itself resulted in at least four hard inquiries. In addition, she had six other inquiries on her credit report that pre-dated March 17, 2018. While there was evidence that her credit rating with Experian had declined from 581 on March 17, 2018 to 562 in August 2019, there is no way to determine how much, if any, of the decline was attributable to Respondent's credit inquiries. In fact, the explanation given on the August 2019 Credit One credit report was not too many inquiries, but "[t]oo many recently reported open bankcard accounts with a high ratio of balance to credit limits."

18. Claimant seeks over $14 million in damages for 35 years of lost earnings, statutory damages of $18.9 million,

plus unquantified amounts for credit damage, loss of credit opportunity, damage to reputation, restitution, increased risk of harm, interest, cost of health insurance, exemplary damages, attorneys' fees, and costs and expenses.

**Allegations of Wrongful Conduct**

19. While characterized differently in her various claims for relief, Claimant's claims of Respondent's wrongdoing are generally of two types: discrimination and misrepresentation.

20. Claimant asserts that Respondent's conduct toward her was discriminatory because she is a member of three protected classes: (1) she is a woman; (2) she is African American; and (3) she is dark-skinned. However, she presented no evidence to support the assertion of discrimination. To the contrary, the failure of her effort to purchase the 2013 Dodge Journey was caused by the rejection of her loan application by at least six lenders who had no information as to Claimant's ethnicity or skin color.

21. Claimant's misrepresentation claims concern four subject matters: (1) Respondent's failure to show in the on-line advertisement for the Mitsubishi Outlander that it was a salvage vehicle; (2) Respondent's signs which invited customers to ask about Respondent's "Credit Approval Guaranteed" and "Guaranteed Credit Approval;" (3) the purchase price of the 2013 Dodge Journey; and (4) whether Respondent would perform only a "soft" credit inquiry.

22. The online advertisement for the Mitsubishi Outlander did omit the fact that it had a salvage title. The testimony established that the omission was inadvertent and not intended to mislead customers. Respondent did not ordinarily sell salvage vehicles and acquired the Outlander under unusual circumstances. Because Respondent was unaccustomed to selling salvage vehicles, it did not think to include "salvage" in the online advertisement. Respondent informed Claimant of the error shortly after she arrived at the car lot and she knew of the error before she began looking at other vehicles. Claimant thus cannot claim any reliance on this misrepresentation.

23. The second subject of alleged misrepresentation concerns the purchase price. Though not part of the Third Amended Demand for Arbitration, Claimant testified at the hearing that her review and assembly of her exhibits had reminded her that she had believed that the purchase price of the 2013 Dodge Journey was supposed to be $16,000.00, not $16,990.00 as shown on the Buyer's Order and Invoice. One exhibit suggested that a price of $16,000.00 was part of the negotiations, but it did not establish that to be the final contract price. The Buyer's Order and Invoice showed the selling price to be $16,990.00 and further required her to acknowledge that, "All promises, verbal understandings, or agreements of any kind pertaining to this purchase not specified herein are not binding on the seller." Claimant signed the Buyer's Order and Invoice and, even though she may not have read it, she is bound to that contract. Claimant did not establish that Respondent made any misrepresentation regarding the purchase price.

24. The third category of alleged misrepresentations arises from the signs posted at the entrance to the Respondent's parking lot and on Respondent's top front window visible from the entrance that invited customers to ask about Respondent's "Credit Approval Guaranteed" and "Guaranteed Credit Approval." These signs do not instill confidence in Respondent's business practices; they could be read to imply that credit approval was unconditionally guaranteed to all customers, particularly since the words "ask about" were significantly smaller than the words referencing credit approval. However, while the signs obviously were meant to entice potential customers to visit the dealership, those customers who asked, as they were invited to do, would have been told accurately that credit actually was guaranteed provided that they made a sufficient down payment. In addition, the contractual documents plainly disclosed that Respondent would be searching for financing and, if none was obtained (an impossibility if financing was guaranteed), Respondent could unwind the transaction. Accordingly, the statements directing customers to ask about Credit Approval Guaranteed and Guaranteed Credit Approval are not actionable misrepresentations.

25. The final subject of alleged misrepresentation concerns the nature of the credit inquiry that Respondent would be performing, which is addressed below.

**Claims for Relief**

26. Count 12 of the Third Amended Demand for Arbitration is a claim for negligent misrepresentation. To prove negligent misrepresentation, Claimant must prove that: (1) Respondent in the course of its business; (2) made a misrepresentation of a material fact, without reasonable care; (3) for the guidance of Claimant in her business transactions; (4) with knowledge that its representations would be relied upon by Claimant; and (5) the injured party justifiably relied on the misrepresentation to her detriment. *Allen v. Steele*, 252 P.3d 476, 482 (Colo. 2011). I find that these elements are satisfied in regard to Respondent's representation that it would only be performing a soft credit inquiry. Regarding damages, however, Claimant admitted that she was unable to quantify any pecuniary losses that arose directly from the hard inquiry that Respondent in fact performed. While I find in favor of Claimant and against Respondent on Count 12, I reserve ruling on the damages, if any, that are recoverable on that claim pending further briefing and potential submission of evidence.

27. I find in favor of Respondent and against Claimant on the remaining claims submitted to arbitration for reasons that include but are not limited to the following.

| Count | Title Per Claimant's Prehearing Brief | Reasons for Ruling |
|---|---|---|
| 1 | Violations of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq. and 12 C.F.R. 202 et seq. ("ECOA") | • No evidence established or created a presumption that Respondent discriminated against Claimant with respect to a credit transaction based on her race, color, or sex, or otherwise violated the ECOA.<br>• Respondent complied with 15 U.S.C. § 1697(d)(1) and 12 C.F.R. § 202.9 by sending an adverse action letter within 30 days that stated the reason for its denial of credit. |
| 2 | Violations of Electronic Signatures in Global and National Commerce, 15 U.S.C. § 7001(c) | • There is no private right of action for violation of this statute; *see Levy-Tatum v. Navient Solutions, Inc.*, 183 F.Supp.3d 701 (E.D. Pa. 2016). |
| 3 | Violations of the Colorado Consumer Protection Act, C.R.S § 6-1-101, et seq. ("CCPA") | • Respondent made no knowing or reckless misrepresentations or otherwise engaged in a deceptive trade practice as defined by C.R.S. § 6-1-105.<br>• Claimant did not establish the requisite public impact. |
| 4 | Violations of Consumer Credit Code, C.R.S. § 5-1-101, et seq. ("UCCC) | • Respondent met the disclosure requirements of C.R.S. § 5-3-101(2).<br>• The RISC and the credit authorizations are written agreements required by C.R.S. § 5-3-108.<br>• It is not clear that Respondent's failure to locate a copy of the loan application violated C.R.S. § 5-3-109, but in any cause no harm was caused to Claimant.<br>• There was no violation of the advertising provisions of C.R.S. § 5-3-110.<br>• There was no violation of C.R.S. § 5-3-210 because no evidence of discrimination was presented.<br>• Neither the RISC nor Respondent's words or |

| | | |
|---|---|---|
| | | conduct were unconscionable, so there is no violation of C.R.S. § 5-5-109. |
| 5 | Violations of the Colorado Uniform Commercial Code, § 4-1-301, et seq. ("UCC") | • No evidence established that Respondent breached the duty of good faith and fair dealing in regard to its performance or enforcement of the RISC.<br>• The RISC, which Claimant signed, plainly disclosed that Respondent could cancel the RISC and demand return of the vehicle if loan approval was denied.<br>• Respondent's exercise of that contractual right did not constitute an acceleration of payment or performance within the meaning of C.R.S. § 4-1-309. |
| 6 | Fraudulent Misrepresentations of the Terms and Conditions of the Sale | • *See* discussion above regarding misrepresentation claims.<br>• A claim of fraudulent misrepresentation requires a *knowing* misrepresentation of material fact. *Williams v. Boyle*, 72 P.3d 392, 399 (Colo. App. 2003). Claimant did not establish that Respondent knew that its representation regarding the soft inquiry was false. |
| 7 | Fraudulent Concealment of Material Facts | • *See* discussion above regarding misrepresentation claims.<br>• "In order to prevail on a claim of fraudulent concealment, a plaintiff must show that a defendant actually knew of a material fact that was not disclosed." *Kopeikin v. Merchants Mortg. and Trust Corp.*, 679 P.2d 599, 601-02 (Colo. 1984).<br>• Claimant did not establish that Respondent's representative knew that a hard inquiry would be performed. |
| 8 | Breach of Contract – Promissory Estoppel | • A claim for promissory estoppel is only available in the absence of an enforceable contract. *See Scott Co. v. MK-Ferguson Co.*, 832 P.2d 1000 (Colo.App.1991).<br>• The RISC, the Buyer's Order and the other documents comprise the enforceable contract, precluding Claimant from recovering on the theory of promissory estoppel. |
| 9 | Breach of Contract | • The only evidence presented as to any breach of contract was that Respondent telephoned Claimant to inform her that Respondent was cancelling the contract rather than sending her notice in writing, as the RISC required.<br>• Claimant incurred no damages from being told of the cancellation and need to return the vehicle verbally rather than in writing.<br>• Damages are an essential element of a claim for |

| | | |
|---|---|---|
| | | breach of contract, so the breach of contract claim fails. |
| 10 | Violation of Unfair Practices Act, C.R.S. § 6-2-101 et seq. | • The Unfair Practices Act is directed toward monopolies and unfair competition. It has no application here.<br>• No evidence was presented to establish that Respondent advertised any goods that were not available in violation of C.R.S. § 6-2-114. |
| 11 | Outrageous Conduct | • Liability for outrageous conduct may only be found when the conduct is so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. *Pearson v. Kancilia*, 70 P.3d 594, 597 (Colo. App. 2003).<br>• Respondent's alleged wrongful conduct was not of that type. |
| 13 | Breach of Fiduciary Duty | • Evidence did not establish a fiduciary relationship between Respondent and Claimant. |
| 14 | Negligence | • Duty of care is a required element of a claim for negligence.<br>• Evidence did not establish that Respondent owed any legal duty to protect Claimant against injury other than that subsumed in the negligent misrepresentation claim, Count 12. |
| 15 | Violations of the Truth in Lending Act, 15 U.S.C. § 1602, et seq. and 12 C.F.R. 226 et seq. ("TILA") | • None of the TILA disclosures in the RISC were inaccurate.<br>• The statements in signage inviting customers to ask about "credit approval guaranteed" or "guaranteed credit approval" were not false representations. |

**Attorneys' Fees and Costs**

28. Claimant seeks an award of attorneys' fees in the amount of $232,600.00 for her time spent on the case at the rate of $200.00 per hour, out-of-pocket litigation costs of $10,843.55, and other costs of $28,471.20.

29. Claimant is not an attorney. Non-attorney *pro se* litigants are not entitled to recover attorneys' fees. *See Wimmershoff v. Finger*, 74 P.3d 529, 530 (Colo. App. 2003), *Key v. Ehrler*, 499 U.S. 432, 438 (1991).

30. Because I have found in favor of Claimant on Count 12 (Negligent Misrepresentation), she will be entitled to an award of costs. However, many of the types of costs that Claimant seeks to recover are not recoverable. For example, Claimant includes such items as groceries and car repairs. Respondent is not required to support Claimant's living expenses during the pendency of this proceeding. Instead, the only types of costs that may be recovered are those listed in C.R.S. § 13-16-122.

## Award

1. I find in favor of Respondent and against Claimant on Counts 1 through 11 and 13 through 15.

2. I find in favor of Claimant and against Respondent on Count 12 (Negligent Misrepresentation), but reserve ruling on the damages, if any, that are recoverable on that claim. It has already been established that Claimant had no direct financial loss. However, on or before **March 30, 2020**, each party may submit written legal argument and authority of not more than **8 pages, double-spaced, 12-point font** as to whether Claimant is entitled to recover damages for emotional distress, bodily injury, and pain and suffering in the absence of direct financial loss. If I determine that Claimant is entitled to seek such damages, I will convene a conference call to determine the best means of receiving such evidence.

3. I find in favor of Respondent and against Claimant on Claimant's claim for attorneys' fees.

4. On or before **April 3, 2020**, Claimant shall submit a revised itemization of costs incurred to date that fall within the categories listed in C.R.S. § 13-16-122. Each entry shall describe the date the cost was incurred, to whom the amount was paid, and the nature of the cost. Receipts shall be provided for any cost in the amount of $50.00 or more. Respondent may respond to the cost itemization in writing on or before **April 10, 2020.**

This Interim Award is in full settlement of the merits of all claims submitted to this Arbitration, except the damages recoverable on Count 12 (Negligent Misrepresentation), the determination of costs recoverable by Claimant, and the allocation of AAA's fees and costs.

This Interim Award shall remain in full force and effect until the Arbitrator renders a Final Award.

March 16, 2020

*Julie M. Williamson*
Julie M Williamson, Arbitrator